IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 DEC -5 AM 10: 33

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

| | | |
|---|---|---|
| FAN LI TAI, | Χ | |
| | Χ | |
| Plaintiff, | Χ | |
| | Χ | |
| vs. | Χ | No. 05-2614-B/V |
| | Χ | |
| FEDEX CORPORATION, et al., | Χ | |
| | Χ | |
| Defendants. | Χ | |
| | Χ | |

ORDER OF PARTIAL DISMISSAL
ORDER TO SHOW CAUSE
AND
ORDER TO FILE AN AMENDED COMPLAINT

Plaintiff Fan Li Tai filed a pro se complaint pursuant to, inter alia, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), on August 24, 2005 and paid the civil filing fee. Plaintiff filed an amended complaint on September 8, 2005.[1] The Clerk shall record the defendants as FedEx Corporation ("FEC"); Federal Express Corporation ("Express"); FedEx Corporate Services, Inc. ("Services"); Denise Burns; Tony Sharp; and Belinda Watkins. The complaint refers to the three corporate defendants, collectively, as FEDEX. The individual defendants are employees of Services. Defendant Watkins was, at the

---

[1]    Pursuant to Fed. R. Civ. P. 15(a), a litigant is entitled to amend his complaint once as a matter of right prior to the service of a responsive pleading. Accordingly, the amended complaint is the operative pleading in this action.

relevant time, a Vice President of Services in charge of information security. Amended Complaint ("Compl."), ¶ 6. Defendant Sharp, the Director of Information Security, reported to Watkins, id., ¶ 7; and defendant Burns, a Manager of Information Security, reported to Sharp, id., ¶ 8.[2]

The plaintiff, a citizen of Malaysia, is a former employee of Services. Compl., ¶ 16. He was hired by defendant Express on December 16, 1999 and, due to a corporate reorganization, was transferred to Services in 2000. Id., ¶¶ 17-18. The plaintiff was a Senior Data Protections Analyst in the Information Security Department. Id., ¶¶ 17, 19-22, 31. He worked as a UNIX system administrator. Id., ¶ 23.

Between May, 2000 and August, 2003, the FEDEX computer systems were attacked by a variety of worms and viruses and, in response, plaintiff created lists of patches required to remove the vulnerabilities exploited by some of those worms and viruses. Id., ¶¶ 24-30. Plaintiff had offered to build a tool to perform "patch management" functions many times, but defendant Sharp allegedly stated that FEDEX preferred to buy an off-the-shelf product. Id.,

---

[2]    The complaint also purports to sue "Does 1-20, individually and severally." These unnamed individuals are apparently management employees of the corporate defendants. However, service of process cannot be made on a fictitious party. Moreover, the filing of a complaint against "John Doe" defendants does not toll the running of the statute of limitation against those parties. See Cox v. Treadway, 75 F.3d 230, 240 (6th Cir. 1996); Bufalino v. Michigan Bell Telephone Co., 404 F.2d 1023, 1028 (6th Cir. 1968). Thus, to the extent plaintiff seeks to bring any complaint against any other individual or entity, he must identify the defendant and file a new lawsuit within the statute of limitations applicable to his claims.

    Moreover, the designation "individually and severally" after the name of each of the individual defendants has no meaning and will be disregarded.

¶ 33. On September 17, 2003, plaintiff sent an email to Jim Barksdale, a member of the board of directors of one of the corporate defendants, about his plan for patching computer systems in the network. The email did not disclose that plaintiff was an employee of Services. Id., ¶ 35. On September 21, 2003, Larry Netter, a FEDEX vice president, sent an email to plaintiff asking for more information. Id., ¶ 36. Plaintiff contacted Netter's office on September 22, 2003 seeking an appointment, but Netter declined to meet with plaintiff once he learned that plaintiff was employed by Services. Id., ¶ 37. Plaintiff met with defendant Sharp and another individual on October 7, 2003 to discuss plaintiff's patch management system. The complaint alleges that

> Plaintiff stated that all he had was a business plan, and [he] does not have a product, nor has any work started on the product. SHARP informed Plaintiff that he would never purchase a patch management solution from Plaintiff even if it was the best in the world because Plaintiff had worked at FEDEX, and therefore, have [sic] knowledge of how FEDEX networks work. This, he stated, would be unfair to other vendors.

Id., ¶ 38.

Plaintiff responded by sending another email to Barksdale on October 9, 2003 to "ask for his advice whether to continue trying to start a company to build a patch management tool, or to stop." Id., ¶ 40. On October 13, 2003, defendant Watkins ordered plaintiff to attend a meeting in her office. Id., ¶ 41. During the meeting, Watkins allegedly made clear that she was unhappy with plaintiff's email to Barksdale, complaining that plaintiff had "skipped 6 levels of management." Id., ¶ 42. Watkins also allegedly stated that plaintiff had violated § 2(a) of the employee agreement

by not informing FEDEX about the "patch management" tool. According
to Watkins, telling Barksdale did not count "because Jim Barksdale
is not part of Fedex" [sic]. Id., ¶ 43. Watkins further claimed
that plaintiff had a conflict of interest, even though he had not
started a company but was only thinking of starting one. Id., ¶ 45.
The complaint asserts that Sharp, who was at the meeting, knew that
several American-born members of his staff had their own computer-
based businesses. Id., ¶ 48; see also id., ¶ 49. Watkins allegedly
suspended plaintiff and also refused to let him leave the meeting
until he wrote a letter explaining why he did what he did, which
plaintiff contends constitutes unlawful imprisonment. Id., ¶ 46.
Plaintiff's suspension did not take effect immediately; instead, it
was finally scheduled for October 23, 2003. Id., ¶ 47.

When plaintiff reported for work on October 24, 2003,
Sharp told him that he was being fired. Plaintiff was informed
about the internal appeal process, called EXPLORE, but Sharp told
him it would not be beneficial for plaintiff to use that process as
the appeal would be decided by the same people who fired him. Id.,
¶ 50. Plaintiff initiated the EXPLORE appeal process, but it was
suspended after he filed a charge of discrimination. Id., ¶ 54-55.
He has yet to learn the result of his appeal. Id., ¶ 56. Plaintiff
asserts that the structure of the EXPLORE process violates his
right to due process. Id., ¶ 51. In addition, the progressive
disciplinary procedures outlined in the employee manual were not
followed in connection with plaintiff's termination. Id., ¶ 52.

Count 1 of the complaint asserts claims of unlawful termination, violations of due process, violations of Title VII, and illegal detention.

In the second count of the complaint, plaintiff asserts that, on October 16, 2003, he made a demand for his <u>Weingarten</u> rights. He asked for a Don Fike, who is apparently a coworker, to be present at some unspecified meeting. Compl., ¶ 58.[3] Although the complaint is not clear, the plaintiff seems to contend that defendant Watkins did not honor his request. <u>See</u> <u>id.</u> Plaintiff further asserts that FEDEX violated his due process rights by refusing to provide him with copies of all relevant policies. <u>Id.</u>, ¶ 60.

In his third claim for relief, plaintiff asserts that he was retaliated against, and terminated without due process, because plaintiff had mentioned that the FEDEX management were incapable of properly protecting the FEDEX network. Compl., ¶ 62. Because plaintiff was terminated after sending an email to Barksdale, plaintiff claims to be a whistleblower. <u>Id.</u>, ¶ 63.[4] The complaint also asserts a violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 <u>et</u> <u>seq.</u> Compl., ¶ 64.[5]

---

[3]     In <u>NLRB v. J. Weingarten, Inc.</u>, 420 U.S. 251 (1975), the Supreme Court interpreted the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 <u>et seq.</u>, as conferring on employees a right to have a union representative present at investigatory meetings that the employee reasonably believes will result in disciplinary action.

[4]     The complaint does not, however, allege the statutory or other legal basis for the plaintiff's whistleblower claim.

[5]     Although ¶ 64 of the amended complaint refers to the possibility of future harm to plaintiff and "Plaintiff Class Members," this is not a class
(continued...)

Plaintiff's fourth claim for relief, based on a theory of promissory estoppel, asserts that plaintiff's application for a "green card" was stopped due to his termination. Defendants Sharp and Burns had allegedly promised "to work on Plaintiff's green card as quickly as possible." Id., § 66. Plaintiff asserts that, in reliance on these promises, he did not apply to work at other companies." Id.

Plaintiff's fifth claim for relief asserts that he was subjected to a hostile work environment. Id., ¶¶ 68-71. Although the complaint is not clear, it appears that plaintiff is alleging that holders of H1B visas, such as himself, who were employed by the Information Security department did not timely obtain their "green cards" so that FEDEX management could exert greater power over them. Id., ¶ 71.

In his sixth claim for relief, plaintiff asserts that he was not promoted to the position of manager. Id., ¶¶ 72-92. Plaintiff allegedly submitted an application for a manager position in or about September, 2002. Id., ¶ 79. Defendant Sharp allegedly articulated pretextual reasons as to why plaintiff was not qualified for that position, id., ¶¶ 80-85, including the fact that he was on an H1B visa, id., ¶¶ 81-82. In or about September, 2003, another individual was hired for the manager position. Id., ¶ 88. Plaintiff asserts that that individual, named Poole, was less

---

[5]      (...continued)
action. The complaint does not purport to be filed on behalf of anyone other than Fan Li Tai, and a pro se litigant cannot prosecute a class action.

6

qualified than he was because he was not interested in security and had no prior security experience. Id., ¶¶ 88-92.

In his seventh claim for relief, plaintiff asserts other violations of Title VII and the Equal Pay Act, 29 U.S.C. § 206(d)(1). Compl., ¶¶ 93-110. In particular, when Services employees received an across-the-board raise in or around January, 2001, plaintiff received a much smaller raise than did his coworkers. Id., ¶ 94. In addition, Tai was not paid for all his on-call time, although two American-born colleagues who shared that duty with plaintiff were compensated. Id., ¶ 95. Plaintiff's signing bonus, which was payable on June 15, 2000, was not paid until eight months later, although other employees received their bonuses in a timely manner. Id., ¶¶ 96-97. Plaintiff was denied the training afforded his American-born counterparts. Id., ¶¶ 98-103. Although every other employee in plaintiff's department who was transferred to Services received the title of Senior Technical Analyst, plaintiff was not given that title. Id., ¶¶ 104-05. Finally, the complaint alleges that, in fiscal year 2003, Burns required plaintiff to take on a workload that was suitable for three employees. Id., ¶¶ 106-07. Plaintiff contends that that work assignment was made in order to reduce his year-end bonus. Id., ¶¶ 107-08.

In his eighth claim for relief, the complaint alleges violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., Compl., ¶¶ 111-17, due to the alleged failure to compensate the plaintiff for his "on-call" time.

The ninth claim for relief alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Compl., ¶¶ 118-25. The allegations in this claim are not clear. Plaintiff seems to contend that the defendants violated 18 U.S.C. §§ 1581 and 1589 by forcing him to work in involuntary servitude and peonage due to the immigration laws, the six-year time limitation on plaintiff's visa, and the fact that termination from his position would result in deportation. Id., ¶¶ 119-21. Moreover, defendants Burns and Sharp made plaintiff copy, provide, and use unlicensed computer programs in violation of 18 U.S.C. §§ 2318-2319. Id., ¶ 121. The complaint also alleges that, during an audit in August of 2003, Sharp told plaintiff to refer all questions of software licensing to him in order to cover up any copyright violations. Id., ¶ 124.

According to the Sixth Circuit, "a district court may not sua sponte dismiss a complaint where the filing fee has been paid unless the court gives the plaintiff the opportunity to amend the complaint." Apple v. Glenn, 183 F.3d 477, 478 (6th Cir. 1999) (per curiam); see also Benson v. O'Brian, 179 F.3d 1014 (6th Cir. 1999); Tingler v. Marshall, 716 F.2d 1109, 1112 (6th Cir. 1983). There is an exception to this general rule, however, that permits a district court to dismiss a complaint "for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure when the allegations of a complaint are totally implausible, attenuated, unsubstantial, frivolous, devoid of merit,

8

or no longer open to discussion." Apple, 183 F.3d at 478 (citing Hagans v. Lavine, 415 U.S. 528, 536-37 (1974)).

As a preliminary matter, the complaint in this action fails to comply with the Federal Rules of Civil Procedure. In particular, Fed. R. Civ. P. 8(a)(2) requires "[a] pleading which sets forth a claim for relief" to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Likewise, Fed. R. Civ. P. 10(b) provides as follows:

> All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances . . . . Each claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters sets forth.

See also Fed. R. Civ. P. 8(e)(1) ("Each averment of a pleading shall be simple, concise, and direct.").

The complaint, as drafted, presents this Court with a management problem since "the pleading is so verbose that the Court cannot identify with clarity the claim(s) of the pleader and adjudicate such claim(s) understandingly on the merits." Harrell v. Directors of Bur. of Narcotics & Dangerous Drugs, 70 F.R.D. 444, 446 (E.D. Tenn. 1975); see also Flayter v. Wisconsin Dep't of Corrections, 16 Fed. Appx. 507, 509 (7th Cir. Aug. 17, 2001) (dismissing 116-page complaint pursuant to Rule 8(a)(2)); Vicom v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 775-76 (7th Cir. 1994) (criticizing district court for declining to dismiss amended complaint with prejudice pursuant to Rule 8(a); noting that "[a] complaint that is prolix and/or confusing makes it difficult for

9

the defendant to file a responsive pleading and makes it difficult for the trial court to conduct orderly litigation); <u>Plymale v. Freeman</u>, No. 90-2202, 1991 WL 54882 (6th Cir. Apr. 12, 1991); <u>Jennings v. Emry</u>, 910 F.2d 1434, 1435 (7th Cir. 1990) ("A . . . complaint must be presented with intelligibility sufficient 'for a court or opposing party to understand whether a valid claim is presented and if so what it is.' . . . And it must be presented with clarity sufficient to avoid requiring a district court or opposing party to forever sift through its pages in search of that understanding.") (citations omitted); <u>Salahuddìn v. Cuomo</u>, 861 F.2d 40 (2d Cir. 1988); <u>Michaelis v. Nebraska State Bar Ass'n</u>, 717 F.2d 437, 438-39 (8th Cir. 1983) (per curiam); <u>Gordon v. Green</u>, 602 F.2d 743 (5th Cir. 1979); <u>Windsor v. A Federal Executive Agency</u>, 614 F. Supp. 1255 (M.D. Tenn. 1983) (ordering plaintiff to amend his complaint to comply with Rule 8).

Although the length of this complaint is not necessarily objectionable, it is extremely unclear. The complaint asserts numerous claims against six defendants, and the Court has been unable to enumerate each of the claims asserted and, with respect to each claim, identify the defendants against whom it is asserted. Certain counts of the complaint, particularly count 1, assert multiple causes of action. Moreover, certain factual allegations of the complaint appear to have no relation to any articulated claim for relief. <u>See, e.g.</u>, Compl., ¶¶ 32, 59, 60, 69, 73-77. Finally, although the complaint makes scattered references to the Sarbanes-Oxley Act of 2002, <u>see</u> Compl., p. 1 & ¶ 32, the complaint does not

appear to assert a claim for relief pursuant to that statute.

Accordingly, the plaintiff is ORDERED, within thirty (30) days of the date of entry of this order, to submit an amended complaint that complies with Rules 8[6] and 10 of the Federal Rules of Civil Procedure. The amendment must be typed or hand printed on 8½ by 11 inch paper, one side to a sheet. The plaintiff must personally sign the amendment. A failure to timely file an amended complaint in response to this order will result in the dismissal of the complaint in its entirety and without prejudice, pursuant to Fed. R. Civ. P. 41(b), for failure to prosecute.

Moreover, certain aspects of the complaint are subject to dismissal. Numerous counts of the complaint assert violations of Title VII. See Compl., Counts 1 (termination), 5 (hostile work environment), 6 (failure to promote), and 7 (unequal pay, delay of bonus, denial of training, unequal title, unfair distribution of workload). Certain aspects of plaintiff's Title VII claims are subject to dismissal.

"In order for federal courts to have subject matter jurisdiction of [employment discrimination] claims, the claimant must first unsuccessfully pursue administrative relief." Ang v. Proctor & Gamble Co., 932 F.2d 540, 545 (6th Cir. 1991). Moreover, any complaint filed by the plaintiff must be "limited to the scope of the EEOC investigation reasonably expected to grow out of the

---

[6]     Rule 8(a) does not require a plaintiff to plead his employment discrimination claims with particularity, Swierkiewicz v. Sorema, S.A., 534 U.S. 506 (2002), although the factual allegations in the complaint must be sufficiently clear to permit the Court and the defendants to ascertain the nature of the claims that are asserted.

charge of discrimination." <u>EEOC v. Bailey Co.</u>, 563 F.2d 439, 446 (6th Cir. 1977) (internal citations omitted). In dealing with <u>pro se</u> litigants, courts have tended to be more lenient in their assessment of what is contained in the charge and its relationship to the content of the complaint. As the Sixth Circuit explained:

> One reason for the expanded rule is that charges are frequently filed by lay complainants, and the courts recognize that subsequent actions should not be restricted by the failure of a complainant to attach the correct legal conclusion to the EEOC claim, conform to procedural technicalities, or include "the exact wording which might be required in a judicial pleading."

<u>Davis v. Sodexho, Cumberland College Cafeteria</u>, 157 F.3d 460, 463 (6th Cir. 1998) (citation omitted); <u>see also</u> <u>Ang</u>, 932 F.2d at 546 (declining to broadly construe a Title VII charge because the plaintiff "was assisted by counsel throughout the administrative investigation. Liberal construction is not necessary where the claimant is aided by counsel in preparing his charge."). Thus, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim. <u>Davis</u>, 157 F.3d at 463.

Attached to the complaint are copies of the plaintiff's EEOC charge, which was filed on June 1, 2004, and the right to sue letter, which was issued on May 27, 2005. The only named respondent is Services. Accordingly, it appears that plaintiff has not exhausted Title VII claims against defendants FEC, Express, Burns,

Sharp, and Watkins.[7] Moreover, an examination of plaintiff's EEOC charge indicates that he has not exhausted his claim of failure to promote (Claim 6). Likewise, although the complaint makes scattered references to race (Compl., ¶¶ 22, 48, 49, 51, 73-78, 110), the plaintiff has not exhausted a race discrimination claim. Accordingly, the Court DISMISSES the complaint, to the extent it purports to assert Title VII claims against any defendant other than Services, for lack of subject-matter jurisdiction. The Court also dismisses Claim 6 with respect to Services for lack of subject-matter jurisdiction. Finally, the Court DISMISSES the Title VII claim with respect to Services, to the extent it purports to assert a race discrimination claim, for lack of subject-matter jurisdiction.

Significant aspects of plaintiff's Title VII claims against Services appear to be time barred. An aggrieved person in a deferral state such as Tennessee must file a formal charge of discrimination within three hundred (300) days of the allegedly discriminatory action, 42 U.S.C. § 2000e-5(e)(1), and must commence a civil action within ninety (90) days of receipt of the right to sue letter, id., § 2000e-5(f)(1). The Supreme Court held in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002), that "[a] discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge

---

[7]     Moreover, any Title VII claim against defendants Burns, Sharp, and Watkins is also subject to dismissal on the ground that there is no remedy under Title VII against a co-worker or supervisor in his or her individual capacity. Wathen v. General Electric Co., 115 F.3d 400, 405 (6th Cir. 1997).

within either 180 or 300 days of the date of the act or lose the ability to recover for it."[8] In this case, the plaintiff filed his EEOC charge on June 1, 2004 and, therefore, any claim concerning a discrete act occurring prior to August 6, 2003, three hundred (300) days prior to the filing of the charge, would appear to be untimely. In particular, much of claim 7, pertaining to the January, 2001 across-the-board pay raise; the delay in paying the plaintiff's signing bonus, which accrued in 2000; the failure to award plaintiff the title of Senior Technical Analyst; the denial of training opportunities; and the unfair work assignments for fiscal year 2003, appear to be time barred.

The statute of limitations is an affirmative defense that ordinarily should not be raised by the Court sua sponte unless it is obvious from the face of the complaint. Fields v. Campbell, 39 Fed. Appx. 221, 223 (6th Cir. June 20, 2002); Haskell v. Washington Township, 864 F.2d 1266, 1273 (6th Cir. 1988). The Court may, however, dismiss the plaintiff's complaint on statute of limitations grounds, pursuant to Fed. R. Civ. P. 12(b)(6), if the plaintiff is first given notice and the opportunity to amend. Cole v. Cox, 41 Fed. Appx. 826, 827 (6th Cir. Aug. 8, 2002). Accordingly, the plaintiff is ORDERED to show cause, within thirty days of the date of entry of this order, why the Title VII claim in

---

[8]     By contrast, where the complaint alleges a hostile work environment, "[i]t does not matter, for purposes of the statute, that some the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 117.

count 7 should not be dismissed as time barred for the reasons stated herein.[9]

Count 2 of the complaint, which alleges violations of plaintiff's Weingarten rights, fails to state a claim on which relief may be granted. As previously noted, see supra p. 5 n.3, the Supreme Court's decision in NLRB v. J. Weingarten, Inc., 420 U.S. 251 (1975), interpreted the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq., as conferring on employees a right to have a union representative present at investigatory meetings that the employee reasonably believes will result in disciplinary action. A Weingarten violation will be found where the request for representation is denied and the employer continues to question the employee. However, notwithstanding its refusal to permit the employee to be questioned in the presence of a union representative, "the employer is free to carry on his inquiry without interviewing the employee and thus leave to the employee the choice between having an interview unaccompanied by his representative, or having no interview and foregoing any benefits that might be derived from one." 420 U.S. at 258.

Although the plaintiff is apparently not a member of a union, he cites the NLRB's decision in Epilepsy Foundation, 331

---

[9]     Claim 7 also asserts a claim pursuant to the Equal Pay Act, 29 U.S.C. § 206(d). Claims brought under the Equal Pay Act are subject to a two-year statute of limitations unless the violation is willful, in which case the statute of limitations is three years. 29 U.S.C. § 255(a). Applying this standard, any Equal Pay Act claim accruing prior to August 24, 2002 is time barred, including any claim arising from the January, 2001 across-the-board pay raise and the delay in paying the plaintiff's signing bonus, which accrued in 2000. As the Equal Pay Act claim is subject to sua sponte dismissal on other grounds, the order to show cause does not encompass this claim.

N.L.R.B. 676 (2000), <u>aff'd in relevant part</u>, 268 F.3d 1095 (D.C. Cir. 2001), <u>cert. denied</u>, 536 U.S. 904 (2002), for the proposition that nonunion employees have <u>Weingarten</u> rights. <u>See</u> Compl., ¶ 58. However, the premise of claim 2, that nonunion employees have <u>Weingarten</u> rights, is no longer legally valid. In <u>IBM Corp.</u>, Nos. 11-CA-19324, -19329, -19334, 2004 WL 1335742 (N.L.R.B. June 9, 2004), the NLRB overruled <u>Epilepsy Foundation</u> and reaffirmed prior precedent holding that "the <u>Weingarten</u> right does not extend to a workplace where, as here, the employees are not represented by a union." <u>Id.</u> at *9. Accordingly, as a nonunion employee, plaintiff does not enjoy <u>Weingarten</u> rights.[10]

To the extent claim 2 asserts a violation of plaintiff's due process rights, <u>see</u> Compl., ¶¶ 58-60, the complaint fails to state a claim. The complaint does not state the sources of plaintiff's so-called due process rights. Plaintiff cannot sue his employer under 42 U.S.C. § 1983 for violating the Due Process Clause of the Fourteenth Amendment because none of the defendants acts under color of state law. "A § 1983 plaintiff may not sue purely private parties." <u>Brotherton v. Cleveland</u>, 173 F.3d 552, 567

---

[10]    The allegations about plaintiff's purported <u>Weingarten</u> claim also fail to state a claim for another reason. The complaint alleges that the meeting that preceded plaintiff's suspension occurred on October 13, 2003, Compl., ¶¶ 41-49, yet plaintiff apparently did not invoke his <u>Weingarten</u> rights until October 16, 2003, <u>id.</u>, ¶ 58. By that time, the decision to suspend the plaintiff had already been made. The very detailed factual allegations in the complaint do not include any claim that, prior to plaintiff's termination on October 24, 2003, Services conducted, or attempted to conduct, an investigatory meeting that plaintiff reasonably believes will result in disciplinary action. Even if there were such a meeting, the decision in <u>Weingarten</u> makes clear that, once a request for representation is denied, the employee must choose between terminating the meeting or proceeding unrepresented. 420 U.S. at 258. In short, there is no private right of action under <u>Weingarten</u> for money damages.

(6th Cir. 1999). Thus, "[i]n order to be subject to suit under §
1983 claim, defendant's actions must be fairly attributable to the
state." <u>Collyer v. Darling</u>, 98 F.3d 211, 231-32 (6th Cir. 1997).
There also is not a collective bargaining agreement in place that
confers due process rights on the plaintiff, and the complaint is
silent as to the existence of any employment contract.

For all the foregoing reasons, the Court DISMISSES claim
2. The Court also DISMISSES claims 1 and 3 to the extent they
assert violations of the plaintiff's due process rights.

Plaintiff's third claim, which is apparently based on the
Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-
18-101 <u>et</u> <u>seq.</u>, also fails to state a claim on which relief may be
granted. The TCPA prohibits "[u]nfair or deceptive acts or
practices affecting the conduct of any trade or commerce." <u>Id.</u>, §
104(a). Moreover, under the TCPA,

> "[t]rade," "commerce," or "consumer transaction" means
> the advertising, offering for sale, lease or rental, or
> distribution of any goods, services, or property,
> tangible or intangible, real, personal, or mixed, and
> other articles, commodities, or things of value wherever
> situated.

<u>Id.</u>, § 103(11); <u>see also</u> <u>id.</u>, § 103(2) (defining "consumer" as "any
natural person who seeks or acquires by purchase, rent, lease,
assignment, award by chance, or other disposition, any goods,
services, or property, tangible or intangible, real, personal or
mixed, and any other article, commodity, or thing of value wherever
situated or any person who purchases or to whom is offered for sale
a franchise or distributorship agreement or any similar type of
business opportunity"). Although the corporate defendants may

17

engage in trade or commerce in connection with their package-delivery business, the TCPA claim in this case arises solely from the employer-employee relationship between Services and plaintiff. There is substantial question whether the TCPA is applicable to such claims. See Quality Auto Parts Co. v. Bluff City Buick Co., 876 S.W.2d 818, 819 (Tenn. 1994) ("We note that other state courts have concluded, as did the trial court and the Court of Appeals, that consumer protection laws do not apply to disputes arising in the context of employer-employee relationships. . . . We, however, find it unnecessary to reach that issue in this case.") (citations omitted). Moreover, an examination of the practices prohibited by the TCPA, which is contained in Tenn. Code Ann. § 47-18-104, does not indicate any basis for a TCPA claim against any defendant, as the complaint does not allege that any defendant used an unfair or deceptive act or practice affecting trade or commerce.

Accordingly, the Court DISMISSES claim 3 to the extent it asserts a claim under the TCPA. If plaintiff's whistleblower claim arises under some other statute, see supra p. 5 n.4, plaintiff may assert it in his amended complaint.

As previously noted, see supra p. 15 n.9, claim 7 also asserts a violation of the Equal Pay Act, 29 U.S.C. § 206(d). The Equal Pay Act "prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work." Buntin v. Breathitt County Bd. of Educ., 134 F.3d 796, 799 (6th Cir. 1998) (citing 29 U.S.C. § 206(d)(1)). The complaint does not allege that the plaintiff was paid lower wages because of his

sex and, therefore, the Court DISMISSES claim 7 to the extent it asserts a violation of the Equal Pay Act.

Finally, the ninth claim alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"A violation of § 1962(c) . . . requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The plaintiff must, of course, allege each of these elements to state a claim." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) (footnote omitted). As presently drafted, this claim fails to state a claim upon which relief may be granted.

An "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The term "'person' includes any individual or entity capable of holding a legal or beneficial interest in property." Id., § 1961(3). "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001); see also Fleischhauer v. Feltner, 879 F.2d 1290, 1297 (6th Cir.

19

1989) ("The 'person' and the 'enterprise' must be separate and different entities. . . . This distinction must be described in the pleadings.") (citations omitted). The complaint has "failed to properly plead and/or identify any enterprise, much less specify the existence of an 'enterprise' separate and distinct from the . . . RICO 'persons.'" <u>Guzowski v. Hartman</u>, 969 F.2d 211, 216 (6th Cir. 1992). For that reason alone, count nine fails to state a claim. <u>Id.</u> at 215-16.[11]

"Racketeering activity" encompasses "any act which is indictable under any of the following provisions of title 18, United States Code," 18 U.S.C. § 1961(1)(B), including violations of 18 U.S.C. §§ 1581-1591 (relating to peonage, slavery, and trafficking in persons), 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), and 2319 (relating to criminal infringement of a copyright).

In this case, the complaint alleges two distinct groups of purported racketeering activities. First, Tai claims that, at the meeting on October 13, 2003, defendant Watkins refused to let the plaintiff leave before he wrote a letter explaining why he had emailed Barksdale. Compl., ¶ 119; <u>see also</u> <u>supra</u> pp. 3-4. According to the complaint, this request

---

[11]    The identification of the appropriate enterprise has implications that this plaintiff may not have foreseen. If, for example, Services is the enterprise, the requirement that the person and the enterprise be distinct means that Services itself cannot be held liable for violating § 1962(c). <u>Puckett v. Tennessee Eastman Co.</u>, 889 F.2d 1481, 1489 (6th Cir. 1989).

> forces Plaintiff to perform a service, and had Plaintiff
> refused, WATKIN's [sic] would have terminated Plaintiff's
> employment right then for insubordination. A termination
> would have resulted in deportation of the Plaintiff, and
> subsequent    loss    of    employment    and    education
> opportunities.    Plaintiff  alleges  that  WATKIN's  [sic]
> illegal detention of Plaintiff is a continuation of the
> pattern and practice of obtaining labor and services by
> threats of serious harm.

Compl., ¶ 119. Similarly, the complaint alleges that the plaintiff

was unlawfully compelled to continue his employment with Services.

In particular, the complaint asserts that:

> Plaintiff had initially agreed to work for the defendant
> COMPANIES, but because of the pattern and practice of
> malicious abuse, and because of the way MANAGEMENT abused
> the immigration laws to lengthen Plaintiff's length of
> service under the conditions of involuntary servitude,
> Plaintiff was no longer interested in working under those
> conditions. However, due to immigration laws and the 6
> year time limit on H1B visas, Plaintiff's choices were to
> suffer serious harm by deportation or to continue working
> for the defendant COMPANIES, creating a condition of
> involuntary servitude and peonage. This directly violates
> 18 U.S.C. § 1581 and 18 U.S.C. § 1589.

Id., ¶ 120.  Second, the complaint states that plaintiff was

required to copy, provide, and use unlicensed computer programs, to

download software for multiple free trials, and, during an audit in

August, 2003, to refer all questions about software licensing to

Sharp, all in violation of 18 U.S.C. §§ 1218 & 2319. Compl., §§

121-22, 124.

       The allegations of the complaint do not establish a

violation of 18 U.S.C. § 1581, which prohibits "hold[ing] or

return[ing] any person to a condition of peonage, or arrest[ing]

any person with the intent of placing him or returning him to a

condition of peonage." The Supreme Court has defined "peonage" as

"a status or condition of compulsory service, based upon the

indebtedness of the peon to the master. The basal fact is indebtedness." <u>Clyatt v. United States</u>, 197 U.S. 207, 215 (1905); <u>see also</u> <u>Bailey v. Alabama</u>, 219 U.S. 219, 242 (1911) ("The essence of [peonage] is compulsory service in payment of a debt. A peon is one who is compelled to work for his creditor until his debt is paid."). In distinguishing peonage from voluntary labor in order to pay off a debt, the Supreme Court emphasized the compulsory nature of the servitude:

> A clear distinction exists between peonage and the voluntary performance of labor or rendering of services in payment of a debt. In the latter case the debtor, though contracting to pay his indebtedness by labor or service, and subject, like any other contractor, to an action for damages for breach of that contract, can elect at any time to break it, and no law or force compels performance or a continuance of the service. . . . That which is contemplated by the statute is compulsory service to secure the payment of a debt.

<u>Clyatt</u>, 197 U.S. at 215-16; <u>see also</u> <u>id.</u> at 218 (classifying peonage as a form of involuntary servitude).[12] In this case, there is no allegation that plaintiff owned a debt to Services or any other defendant, and that he was actually compelled by the defendants, against his will, to continue his employment with Services in order to repay that debt. For that reason, 18 U.S.C. § 1581 has no application here.

_____

[12]    <u>Cf.</u> <u>Pollock v. Williams</u>, 322 U.S. 4, 18 (1944) ("Whatever of social value there may be, and of course it is great, in enforcing contracts and collection of debts, Congress has put it beyond debate that no indebtedness warrants a suspension of the right to be free from compulsory service. This congressional policy means that no state can make the quitting of work the component of a crime, or make criminal sanctions available for holding unwilling persons to labor.").

22

The complaint also does not claim a violation of 18 U.S.C. § 1589, which prohibits

> knowingly provid[ing] or obtain[ing] the labor or services of a person—
>
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
>
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
>
> (3) by means of the abuse or threatened abuse of the law or the legal process.

18 U.S.C. § 1589. The United States Court of Appeals for the First Circuit has summarized the genesis of this statute as follows:

> Section 1589 is a recent addition to the chapter that makes criminal acts of slavery, peonage and holding to involuntary servitude, 18 U.S.C. §§ 1581-1594 (2000). Adopted in 2000 as part of a broader set of provisions—the Victims of Trafficking and Violence Protection Act of 2000, 114 Stat. 1464—section 1589 was intended expressly to counter <u>United States v. Kozminski</u>, 487 U.S. 931 . . . (1988). <u>See</u> H.R. Conf. Rep. No. 106-939, at 100-01 (2000). In <u>Kozminski</u> the Supreme Court had interpreted the pre-existing ban on "involuntary servitude" in section 1584 to prohibit only conduct involving the use or threatened use of <u>physical</u> or <u>legal</u> coercion. 487 U.S. at 949-52 . . . .
>
> In glossing the new statute, the conference report said "serious harm" was intended to encompass not only physical violence, but also more subtle psychological methods of coercion—"such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." H.R. Conf. Rep. No. 106-939, at 101. It continued: "The term 'serious harm' as used in this Act refers to a broad array of harms, including both physical and nonphysical. . . ." <u>Id.</u>

<u>United States v. Bradley</u>, 390 F.3d 145, 150 (1st Cir. 2004) (emphasis added), <u>vacated on other grounds</u>, 125 S. Ct. 2543 (2005).

The First Circuit further elaborated in the meaning of "serious harm" in the context of nonphysical coercion:

> We do agree that the phrase "serious harm," as extended to nonphysical coercion, creates a potential for jury misunderstanding as to the _nature_ of the pressure that is proscribed. Taken literally, Congress' "threats" and "scheme" language could be read to encompass conduct such as the employer's "threat" not to pay for passage home if an employee left early. Depending upon the contract, surely such a "threat" could be a legitimate stance for the employer and not criminal conduct.
>
> Thus, in an appropriate case we think that the court in instructing the jury would be required to draw a line between improper threats or coercion and permissible warnings of adverse but legitimate consequences.

Id. at 151 (emphasis in original).

At most, ¶ 120 of the complaint alleges that, because plaintiff was in the United States on an H1B visa, he was forced to continue working for FEDEX or face deportation. This falls far short of an allegation that any defendant compelled plaintiff to remain in the employ of Services by threatening him or any other person.[13] Instead, plaintiff has only described his understanding of the legal effect of his H1B visa.[14] Accordingly, the complaint does not allege a violation of 18 U.S.C. § 1589.

---

[13]   The complaint also does not allege that any defendant physically restrained the plaintiff or abused the legal process.

[14]   Plaintiff's understanding also appears to be factually inaccurate. According to the U.S. Citizenship and Immigration Services, a bureau of the Department of Homeland Security, "[a]s long as the alien continues to provide H-1B services for a U.S. employer, most changes [in an alien's circumstances] will not mean that an alien is out of status. An alien may change H-1B employers without affecting status, but the new H-1B employer must file a new Form I-129 petition for the alien before he or she begins working for the new employer." U.S. Citizenship and Immigration Services, H-1B Frequently Asked Questions, available at http://uscis.gov/graphics/howdoi/h1b.htm.

The Court will assume, for purposes of this order only, that the complaint alleges violations of 18 U.S.C. §§ 2318 and 2319.[15] The statute privates a private right of action for "[a]ny person injured in his business or property by reason of a violation of" § 1962©. 18 U.S.C. § 1964©. "[T]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." Sedima, S.P.R.L., 473 U.S. at 496. In this case, the plaintiff has not been injured in his business or property by the purported violations of 18 U.S.C. §§ 2318 and 2319[16] and, therefore, he has no standing to assert a RICO claim based on this alleged conduct.

For all the foregoing reasons, count nine cannot withstand a motion pursuant to Fed. R. Civ. P. 12(b)(6). Accordingly, the plaintiff is ORDERED to show cause, within thirty (30) days after the date of entry of this order, why that claim should not be dismissed for the reasons stated herein. Plaintiff's response to this portion of the order can take the form of the amended complaint that cures the deficiencies addressed herein.

---

[15]   The Court also will not address at length, at this time, whether the allegations are sufficient to constitute a "pattern of racketeering activity." Pursuant to 18 U.S.C. § 1961(5), a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

[16]   The complaint does not even allege that these alleged copyright violations had any role in the plaintiff's termination. Even if such an allegation were made, plaintiff still has no standing to assert a RICO claim because his termination was not itself a RICO violation. Beck v. Prupis, 529 U.S. 494, 505-06 (2000).

<u>Conclusion</u>

In sum, the Court has dismissed counts 1 (the due process claim), 2 (the due process and <u>Weingarten</u> claims), 3 (the due process claim and TCPA claims), and 7 (the Equal Pay Act claim), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3), for lack of subject-matter jurisdiction. The Court has also dismissed the Title VII claims, wherever asserted, against defendants FEC, Express, Burns, Sharp, and Watkins, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3), for lack of subject-matter jurisdiction.

The plaintiff has been ordered, within thirty (30) days of the date of entry of this order, to file an amended complaint that complies with Fed. R. Civ. P. 8 and 10. To the extent the plaintiff elects to pursue claim 9, the RICO claim, his amended complaint should correct the deficiencies in that claim. Finally, the plaintiff has been ordered, within thirty days of the date of entry of this order, to show cause why the Title VII claims in count 7, with respect to Services, should not be dismissed as time barred.

IT IS SO ORDERED this ___ day of December, 2005.

_____
J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 3 in
case 2:05-CV-02614 was distributed by fax, mail, or direct printing on
December 5, 2005 to the parties listed.

---

Fan Li Tai
384 Sherburne Cove
Cordova, TN 38018

Honorable J. Breen
US DISTRICT COURT